[Cite as *Garrison Southfield Park, L.L.C. v. Aspen Specialty Ins. Co.*, 2022-Ohio-709.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Garrison Southfield Park L.L.C., :

      Plaintiff-Appellant, :

                              No. 21AP-21

v. :     (C.P.C. No. 17CV-1232)

Aspen Specialty Insurance Company et al., :    (REGULAR CALENDAR)

      Defendants-Appellees. :

---

D E C I S I O N

Rendered on March 10, 2022

---

**On brief:** *Benesch Friedlander Coplan & Aronoff LLP*, and *Mark Tucker*; *Katten Muchin Rosenman LLP*, and *Philip A. Nemecek*, pro hac vice; *King & Spalding LLP*, and *Karl R. Heisler*, pro hac vice, for appellant. **Argued:** *Philip A. Nemecek* and *Karl R. Heisler*.

**On brief:** *Janik L.L.P.*, *Steven G. Janik*, and *Crystal L. Maluchnik*; *Nicolaides Fink Thorpe Michaelides Sullivan LLP, Matthew J. Fink, Amy Collins Cassidy*, and *Mark J. Sobczak*, for appellee Aspen Specialty Insurance Company. **Argued:** *Amy Collins Cassidy*.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Plaintiff-appellant, Garrison Southfield Park L.L.C. ("Garrison"), appeals the December 18, 2020 decision and entry of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees Aspen Specialty Insurance Company ("Aspen") and Closed Loop Refining and Recovery, Inc. ("Closed Loop"), and the trial court's December 23, 2020 judgment entry. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2}    This matter arises out of an insurance claim for environmental issues at two properties located at 1655 and 1675 Watkins Road in Columbus, Ohio (collectively, the "Watkins Road properties"). As will be detailed in this factual summary, Garrison alleged that Aspen failed to honor its contractual obligations to provide coverage for the clean-up of alleged pollution incidents at the Watkins Road properties.

### A.  Closed Loop's Operations at the Watkins Road Properties

{¶ 3}    On April 6, 2012, Closed Loop entered into a lease agreement for 1675 Watkins Road with Garrison's predecessor in interest.  Under the lease, Closed Loop stated that its business at the property included "[w]arehousing, distribution, electronic recycling and de-manufacturing of cathode ray tubes" ("CRTs").  CRTs are vacuum tubes primarily composed of glass, including leaded glass, that were used as components of electronic devices including televisions and computer monitors.[1]  Closed Loop accepted and processed intact electronic devices, as well as separate CRTs and broken CRT glass, in order to separate the leaded glass from the unleaded glass and retrieve other recyclable materials from the electronic devices.  The lease required Closed Loop to maintain specified insurance policies, including a "Pollution and Remediation Legal Liability Policy," including the property owner as an additional insured party under all such policies.  On March 24, 2014, Closed Loop entered into a temporary occupancy agreement with Garrison for the use of the property at 1655 Watkins Road. Under the terms of the temporary

---

[1] Various sources have noted the regulatory efforts surrounding and environmental challenges posed by the hazardous components contained in discarded electronic devices, specifically including CRTs. *See United States v. Richter*, 796 F.3d 1173, 1179 (10th Cir.2015) ("CRTs cannot be disposed of in a landfill because of the risk that the lead will leach into the soil."); Note: IDump: How the United States Should Use Disposal Bans to Legislate Our Way Out of the Electronic Waste Crisis, 39 Wm. & Mary Envtl. L. & Pol'y Rev. 483, 488 (2015) ("The rapid shift in television technology from cathode ray tubes ('CRT') to liquid crystal display ('LCD') flat screens has destroyed the recycling value of the older glass tube televisions. While the glass tubes used to be melted down and profitably turned into new units, the obsolescence of CRT technology has destroyed any business incentive to recycle the cathode ray tubes. As a result of these CRT televisions abruptly becoming financially burdensome for the recycling companies to which they have been entrusted (and the serious image and legal problems that would result if they simply disposed of the electronics in landfills themselves), staggering amounts of CRT televisions and monitors have been abandoned in warehouses the size of football fields, creating mountains of broken glass, billowing lead dust clouds and a costly clean up task for the state and the warehouse owners."); Comment: Addressing the E-Waste Crisis: The Need for Comprehensive Federal E-Waste Regulation within the United States, 14 Chap. L. Rev. 195, 209 ("In 2006, the EPA introduced the CRT rule, which recognized CRTs as hazardous waste and placed regulations on their export."); United States Environmental Protection Agency, Cathode Ray Tubes (CRTs), https://www.epa.gov/hw/cathode-ray-tubes-crts-0 (accessed Mar. 10, 2022).

occupancy agreement, Closed Loop was permitted to "use the Premises solely for warehousing and storage purposes and for no other use." (July 7, 2017 Aspen Mot. for Sum. Jgmt. ("MSJ"), Ex. A-32 at 14.) As with the lease for the 1675 Watkins Road property, Closed Loop was required to maintain insurance policies naming Garrison as an additional insured party.

### B. Closed Loop's Insurance Policies with Aspen

{¶ 4} Pursuant to its obligations under the lease agreement and temporary occupancy agreement for the Watkins Road properties, Closed Loop obtained a series of insurance policies in the form of a Commercial General Liability and Environmental Exposure Policy (the "GLEE policy") from Aspen.[2] On the application for the GLEE policy, Aspen asked Closed Loop a number of questions. When asked on the GLEE policy application whether "[d]uring the last five years, has the applicant been prosecuted or is the applicant currently being prosecuted for contravention of any standard or law relating to the release or threatened release of a hazardous substance, hazardous waste or other pollutant as defined by applicable environmental regulations," Closed Loop responded "No." (MSJ, Ex. 15.) When asked to "[l]ist all claims made against the applicant during the past 5 years for clean-up or response action, 'toxic tort' or other bodily injury or property damage, resulting from the release of hazardous substances, hazardous waste, or other pollutant, from this location or other locations owned [and] operated by the applicant, into the environment," Closed Loop did not respond. (Ex. 15.) When asked on the GLEE policy application whether "[a]t the time of signing this application, is the applicant's manager or supervisor responsible for environmental affairs, control or compliance or any officer, director or partner of the applicant aware of any facts or circumstances which may reasonably be expected to result in a claim or claims being asserted against the applicant for environmental cleanup, or for bodily injury or property damage arising from the release of pollutants into the environment," Closed Loop responded "No." (Ex. 15.)

{¶ 5} The GLEE policy contains several terms and provisions at issue in the present matter. A notice at the beginning of the first page of the GLEE policy provides as follows: "Coverage Sections 3 and 4 contain Claims Made and Reported coverages and this Policy otherwise contains provisions which restrict coverage and are unique. The insured should

---

[2] On April 13, 2015, Closed Loop applied for the insurance policy at issue in this case.

read the entire Policy carefully to determine rights, duties and what is and is not covered." (MSJ, Ex. A-13, Part 1 at 7.)

{¶ 6} The GLEE policy defines "[p]ollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, silt, sediment, fumes, acids, alkalis, chemicals, hazardous substances, petroleum hydrocarbons, low level radioactive matter or waste, microbial matter including legionella pneumophila, medical, infectious or pathological waste or waste materials, electromagnetic fields or biological agent." (Emphasis omitted.)   (Ex. A-13, Part 2 at 5.) "Pollution incident" is defined as "the discharge, emission, seepage, migration, dispersal, release or escape of any pollutant into or upon land, or any structure on land, the atmosphere or any watercourse or body of water including groundwater, provided such pollutant is not naturally present in the environment in the concentration or amounts discovered."  (Emphasis omitted.)  (Ex. A-13, Part 2 at 5.) "Clean-up cost" is defined as "reasonable and necessary expense incurred with our written consent, including legal expense and restoration cost, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated air, soil, surface water or groundwater or other contamination caused by a pollution incident," subject to certain specified restrictions.  (Emphasis omitted.)  (Ex. A-13, Part 1 at 28.)

{¶ 7} At issue in this case is the coverage for site pollution incident clean-up costs at the Watkins Road properties.  Section I, Subsection 3 of the GLEE policy covered site pollution incident liability, providing as follows:

> Provided the pollution incident takes place in the coverage territory and commences on or after the retroactive date, if applicable, and before the end of the policy period, we will pay those sums that the insured becomes legally obligated to pay as:
>
> Coverage 3A — On-Site Clean-Up Costs
>
> Clean-up costs on, at or under an insured location or non-owned location, provided:
>
> (i) the pollution incident is both first discovered by a responsible executive and reported to us during the policy period; or
>
> (ii) a claim for clean-up costs is first made against the insured and reported to us in writing during the policy period or the extended reporting period, if applicable.

(Emphasis omitted.)  (Ex. A-13, Part 1 at 19.) Exclusions to Coverage 3A above included, among others, the following:

> c. Expected or Intended
>
> Bodily injury, property damage or clean-up costs expected or intended by a responsible executive.
>
> * * *
>
> g. Material Change In Use
>
> Bodily injury, property damage or clean-up costs arising out of a change in use of or operations at any insured location that is materially different from the use or operations at the inception date.

(Emphasis omitted.)  (Ex. A-13, Part 1 at 20-21.)  Section V, which applied to Coverage 3A for on-site clean-up costs, contained provisions pertaining to the extended reported period as follows:

> If the Policy was not terminated due to non-payment of premium, or fraud or misrepresentation in the application for this Policy, and the first Named Insured has not purchased any other insurance to replace this insurance, we will provide an Automatic Extended Reporting Period as described in Paragraph A below * * *[.]
>
> A.  Automatic Extended Reporting Period
>
> The Automatic Extended Reporting Period is 90 days following the end of the policy period.  A claim first made against the insured and reported to us during the Automatic Extended Reporting Period will be deemed to have been first made against the insured and reported to us on the last day of the policy period, provided the pollution incident or wrongful act commenced on or after any applicable retroactive date and before the end of the policy period.

(Emphasis omitted.) (Ex. A-13, Part 1 at 30.)

{¶ 8}  Section IV of the GLEE policy covered rights and duties of the insurer and insured. With regard to the insured's duties in the event of an occurrence, offenses, pollution incident or wrongful act, Section IV(A) provided the following:

> You must notify us as soon as practicable of any occurrence, offense, pollution incident, or wrongful act, whether or not you have received a claim or suit.  To the extent possible, such notice should include:

1.  How, when and where the occurrence, offense, pollution incident or wrongful act took place;

2. The names and addresses of any injured persons and witnesses; and

3.  The nature and location of any injury or damage arising out of the occurrence, offense, pollution incident or wrongful act.

(Emphasis omitted.)  (Ex. A-13, Part 1 at 28.)  Furthermore, Section IV(C) provided the following with respect to pollution incidents:

In the event the insured becomes aware of a pollution incident or imminent threat thereof, the insured must:

a. Promptly report the pollution incident or imminent threat thereof to us and to the appropriate governmental authority as required by environmental law;

b. Mitigate and clean-up any pollution incident or imminent threat thereof to the extent required by environmental law by retaining an environmental professional;

c. Provide us with proposed work plans, bids, contracts, agreements or any similar document, concerning work to result in clean-up cost (except for emergency response cost), which proposals shall be subject to our right to prior approval[.]

(Emphasis omitted.)  (Ex. A-13, Part 1 at 29.)  Section IV(E), which covered the "Insured's Right to Give Notice of Possible Claim Under Coverages 3A-3C (Site Pollution Incident Liability)," provided as follows:

If during the policy period the insured becomes aware of a pollution incident that commenced on or after any applicable retroactive date and before the end of the policy period, and which may reasonably be expected to give rise to a claim against the insured, the insured may give us written notice during the policy period of such pollution incident and the reasons for believing that a claim may arise. Such notice must include the following to the extent possible:

1. The circumstances under which the insured first became aware of the pollution incident;

2. The nature, location and date of commencement of the pollution incident; and

3.  The identity of anticipated or potential claimants;

4.  The bodily injury, property damage or clean-up cost that has resulted or may result from the pollution incident;

5. All available engineering information relating to the pollution incident; and

6. Any other information that we deem reasonably necessary.

(Emphasis omitted.) (Ex. A-13, Part 1 at 29.)

{¶ 9} Under the terms of the GLEE policy, Garrison was endorsed on the policy as an additional insured with the limitation that coverage as an additional insured applied: "(a) Solely to the additional insured's liability arising out of the insured's ownership, operation, maintenance or use of the corresponding scheduled insured location(s); and (b) Only if the additional insured is named in a suit as a co-defendant with the insured, alleging the additional insured is liable on the basis described in paragraph (a) above." (Emphasis omitted.) (Ex. A-13, Part 2 at 24.) With respect to coverage under Section 3 for Site Pollution Incident Liability, the property at 1675 Watkins Road was listed as an insured location with a retroactive date of April 1, 2012 and the property at 1655 Watkins Road was listed as an insured with a retroactive date of January 11, 2016. Coverage under the GLEE policy for the period at issue in this case extended from 12:01 a.m. on April 12, 2015 through 12:01 a.m. on April 12, 2016.

## C. Environmental Violations at the Watkins Road Properties

{¶ 10} In a letter dated October 17, 2013, the Ohio Environmental Protection Agency ("Ohio EPA") sent Closed Loop a "Notice of Violation" letter reflecting the results of a September 30, 2013 complaint investigation of Closed Loop's facility at 1675 Watkins Road. Ohio EPA found that Closed Loop was in violation of Ohio's hazardous waste laws, specifically including provisions related to hazardous waste treatment, storage, and disposal under R.C. 3734.02(E) and (F). Ohio EPA found that "[a]t the time of the inspection[,] Closed Loop was storing approximately 300 pallets of broken CRTs outside in cardboard * * * containers [that] had deteriorated to the point that they could no longer hold the CRTs, and CRT glass and parts were strewn throughout the storage area. In addition, the facility was storing approximately 450 pallets of televisions outside; due to storage conditions, some of these CRTs had broken as well." (MSJ, Ex. A-5, No. 3 at 1.) Ohio EPA found that due to violations of Ohio Administrative Code provisions and R.C. 3734.02(E) and (F), Closed Loop had rendered the property at 1675 Watkins Road an "illegal storage and disposal facility." (Ex. A-5, No. 3 at 2.)

{¶ 11} On June 10, 2014, Ohio EPA mailed Closed Loop a copy of an Expedited Settlement Agreement and Director's Order pursuant to R.C. 3734.13 and 3745.01. In the letter, Ohio EPA noted it had received documentation from Closed Loop demonstrating that Closed Loop had moved the CRTs, televisions, and CRT waste from the outside storage area into a building on the premises. In settlement of Ohio EPA's claim for civil penalties, Closed Loop agreed to pay a fine in the amount of $2,200.

{¶ 12} On April 2, 2015, Ohio EPA sent another Notice of Violation letter to Closed Loop. In the letter, Ohio EPA found Closed Loop was engaging in "[o]peration of air contaminant sources without a permit" in violation of Ohio Adm.Code 3745-31-02(A) and R.C. 3704.05(A). (Ex. A-5, No. 8 at 1.) Ohio EPA noted that during its January 27, 2015 site visit, "it was discovered that a CRT breaker was installed and operating without a permit-to-install and operate (PTIO) application being [filed] with Ohio EPA." (Ex. A-5, No. 8 at 1.) Ohio EPA found that Closed Loop needed to reduce indoor air pollution outside of the CRT breaker area because "[p]ollutants that are outside the breaker room are free to vent outside the building through open loading doors or the building[']s ventilation." (Ex. A-5, No. 8 at 1.)

{¶ 13} On February 26, 2016, Ohio EPA sent Closed Loop a letter, a copy of which was sent to Garrison, requesting information regarding speculative accumulation of CRT glass at Closed Loop's 1675 Watkins Road facility. In the letter, Ohio EPA specifically stated that it sought to determine whether "Closed Loop's operations are complying with the speculative accumulation provisions" in the Ohio Administrative Code. (MSJ, Ex. A-34 at 1.) Ohio EPA noted that failing to demonstrate that it was not speculatively accumulating CRT glass "would cause the CRTs to become hazardous waste subject to full regulations under Ohio's hazardous waste laws." (Ex. A-34 at 2.)

{¶ 14} On April 11, 2016, Ohio EPA mailed Closed Loop a notice of violation, a copy of which was sent to Garrison, finding that Closed Loop's facility at 1675 Watkins Road was in violation of R.C. 3734.02(E) and (F), Ohio Adm.Code 3745-52-34(C)(1)(b) and (D)(2), and 3745-66-71. In the letter, Ohio EPA stated that "[s]ince approximately mid-2015, Closed Loop failed to demonstrate that processed CRT glass stored at Closed Loop's

Watkins Road Facility was not speculatively accumulated." (MSJ, Ex. A-42 at 2.)[3] Because Closed Loop was speculatively accumulating processed CRT glass, Ohio EPA determined that "Closed Loop has been storing, at a minimum, hazardous waste processed CRT glass, which is characteristically hazardous for toxicity (lead) as described in [Ohio Adm.Code] 3745-51-24 in violation of [R.C.] 3734.02(E) and (F)." (Ex. A-42 at 2.) As a result, Ohio EPA notified Closed Loop that "[a]lthough no further action is being required by Ohio EPA at this time, be advised that due to the nature of the violation Ohio EPA may require closure" of the facility. (Ex. A-42 at 2.) Following its April 11, 2016 notice of violation letter, Ohio EPA referred Closed Loop to the Attorney General of Ohio for initiation of enforcement actions against Closed Loop.

### D. Garrison's Proceedings Against Closed Loop and Notice to Aspen

{¶ 15} On August 3, 2015, prior to the initiation of the present case and during the pendency of Ohio EPA's investigations of Closed Loop, Garrison filed a complaint for eviction, injunction, and damages against Closed Loop regarding the property at 1655 Watkins Road. In the complaint, Garrison sought to evict Closed Loop from the property at 1655 Watkins Road in addition to $163,409.63 resulting from alleged breaches of the occupancy agreement between Closed Loop and Garrison. In support of its claim for injunctive relief to compel Closed Loop to remove personal property from the property, Garrison stated:

> Upon information and belief, Defendant is storing approximately 300 semi-truck loads of discarded cathode ray tubes and ancillary scrap materials ("Defendant's Personal Property"), approximately eleven (11) million pounds of scrap property, at the Premises. It would take Garrison months, and cost substantially more than a million dollars, to remove Defendant's Personal Property from the Premises. Furthermore, Defendant's abandonment of the scrap Personal Property at the Premises is likely to subject Garrison to oversight and regulation by the Ohio Environmental Protection Agency, causing Garrison additional significant costs that

---

[3] Under Ohio Adm.Code 3745-51-01(C)(8): "[a] material is 'accumulated speculatively' if the material is accumulated before being recycled. A material is not accumulated speculatively if the person accumulating the material can show that the material is potentially recyclable and has a feasible means of being recycled; and that during the calendar year commencing January first, the amount of material that is recycled, or transferred to a different site for recycling, equals at least seventy-five per cent by weight or volume of the amount of that material accumulated at the beginning of the calendar year."

> cannot be quantified. Garrison has neither the expertise nor the capability to dispose of the enormous amount of Defendant's Personal Property if Defendant leaves it at the Premises upon vacating the Premises.

(Ex. A-5, No. 14 at 3.)

{¶ 16} On March 4, 2016, in a separate case, Garrison filed a complaint for eviction, injunction, and damages against Closed Loop seeking Closed Loop's eviction from the property at 1675 Watkins Road. In the complaint, Garrison stated:

> Closed Loop has breached the Lease by leaving the Premises with millions of pounds of discarded cathode ray tubes and ancillary scrap materials (the "Scrap Material") filling the Premises and otherwise contaminating the Premises. It will cost Garrison millions of dollars to remove the Scrap Material from the Premises and have it deposited at an appropriate land fill, and to remediate Defendant Closed Loop's contamination of the Premises (together, the "Environmental Clean-Up").

> As a result of Defendant Closed Loop's breach of the Lease by leaving the Premises with millions of pounds of the Scrap Material and otherwise contaminating the Premises, the Ohio Environmental Protection Agency (the "Ohio EPA") is threatening to bring enforcement actions against Garrison to perform the Environmental Clean-Up for the Premises.

(Ex. A-5, No. 12 at 4.) Garrison further stated that "Closed Loop's abandonment of the Scrap Material at the Premises is likely to subject Garrison to oversight and enforcement actions by the Ohio Environmental Protection Agency and/or the U.S. Environmental Protection Agency, causing Garrison additional significant costs that cannot be quantified." (Ex. A-5, No. 12 at 6.) Garrison sought damages in the amount of $3,986,545.97 under the lease in addition to amounts to be determined for the damage to the property and "[a]n amount to be determined at trial, totaling millions of dollars, for the costs incurred by Garrison to perform the Environmental Clean-Up of the Premises." (Ex. A-5, No. 12 at 5.)

{¶ 17} On May 6, 2016, Garrison sent Closed Loop a letter, a copy of which was also sent to Aspen, in which Garrison provided "notice to Closed Loop of Garrison's claim for any and all costs and/or damages incurred by Garrison that could relate to the pollution conditions" at the Watkins Road properties. (MSJ, Ex. A-43 at 1.) On May 9, 2016, Aspen sent a letter to Closed Loop acknowledging receipt of the May 6, 2016 letter, assigned a

claim number, and stated that it would review the information provided to determine whether coverage was available under the GLEE policy.

### E.  Proceedings in this Action

{¶ 18} On February 3, 2017, Garrison filed a complaint seeking damages and a declaratory judgment against Aspen and Closed Loop for an alleged breach of contract.  On September 11, 2017, Garrison filed a motion for leave to file a supplemental complaint, attaching its supplemental complaint to the motion.

{¶ 19}  In its supplemental complaint, Garrison alleged that on August 7, 2017 it was awarded a final judgment against Closed Loop in the amount of $18,382,423.70 resulting from Garrison's August 3, 2015 and March 4, 2016 actions against Closed Loop which were consolidated on April 12, 2017.   As part of the total award, Garrison was awarded $14,181,553.74 with interest from August 7, 2012 for "costs to clean-up the CRT Waste that resides at the [Watkins Road properties]" because the court found that Closed Loop had "engaged in the speculative accumulation and subsequent abandonment and disposal of the CRT Waste at the [Watkins Road properties]."  (Supp. Compl. at 7.)  In its supplemental complaint in this case, Garrison alleges that "Closed Loop's abandonment of CRT waste, and the spillage, release and dispersal of hazardous leaded glass and hazardous lead dust throughout the Watkins Road Properties from the CRTs constitute a 'pollution incident' that implicates coverage under the Aspen Policy's 'Site Pollution Incident Liability' coverage part for the 'clean-up cost' or remediating the Watkins Road Properties, and is not otherwise excluded under the Aspen Policy's terms and conditions."  (Supp. Compl. at 12-13.)   Garrison alleged that Aspen was contractually obligated under the GLEE policy to "provide coverage to Garrison for the 'clean-up cost' of remediating the 'pollution incident' that occurred at the Watkins Road Properties."  (Supp. Compl. at 15.)  Garrison alleged that "[i]n the alternative, pursuant to the terms of the [GLEE] Policy, Aspen is contractually obligated to provide coverage to Closed Loop for its liability to Garrison, established by the Final Judgment entered on August 7, 2017 in favor of Garrison and against Closed Loop in the 1655 Watkins Road Litigation and the 1675 Watkins Road Litigation, for the 'clean-up cost' of remediating the 'pollution incident' that occurred at the Watkins Road Properties."  (Supp. Compl. at 16.)

{¶ 20} On September 26, 2017, the trial court filed an agreed order granting Garrison leave to file its supplemental complaint. On October 13, 2017, Aspen filed an answer to Garrison's supplemental complaint.

{¶ 21} On April 12, 2018, Aspen filed a motion for partial summary judgment on Garrison's claims that it was an insured entitled to coverage for clean-up costs under the policy. On April 26, 2018, Garrison filed a memorandum contra Aspen's April 12, 2018 motion for partial summary judgment.

{¶ 22} On July 17, 2018, Aspen filed another motion for summary judgment. On July 31, 2018, Garrison filed a memorandum contra Aspen's July 17, 2018 motion for summary judgment. On August 14, 2018, Aspen filed notice of a corrected motion for summary judgment filed July 17, 2018 and supporting materials. On August 21, 2018, Garrison filed a response to Aspen's August 14, 2018 corrected motion for summary judgment.

{¶ 23} On December 18, 2020, the trial court filed a decision and entry granting Aspen's April 12, 2018 motion for partial summary judgment and July 17, 2018 motion for summary judgment. In its decision, the trial court found the GLEE policy issued by Aspen did not cover Garrison's claim for clean-up costs to remediate the alleged pollution incidents at the Watkins Road properties for three reasons. First, the trial court found Garrison's claim for coverage was not made and reported during the policy period from April 12, 2015 to April 12, 2016, as required by the claims made GLEE policy. Second, the trial court found the alleged pollution incident at the 1655 Watkins Road property occurred and was known to Garrison prior to the January 11, 2016 retroactive date. Third, the trial court found that Garrison's claim for clean-up cost under Coverage 3A of the GLEE policy was not due to a "pollution incident" as defined in the policy and, therefore, is not subject to coverage. On December 23, 2020, the trial court filed a judgment entry entering judgment in favor of Aspen and dismissing Garrison's complaint.

## II. Assignments of Error

{¶ 24} Garrison appeals and assigns the following four errors for our review:

[I.] The trial court erred as a matter of law in concluding that Plaintiff's claim for "clean-up costs" under Section 3A of the Commercial General Liability & Environmental Exposure Policy No. ERA9VP115 (the "GLEE Policy") was not due to a "pollution incident."

[II.] The trial court erred as a matter of law in concluding that Plaintiff's claim is not covered by the GLEE Policy because it arises out of the named insured's anticipated regular business activities or a change in the named insured's operations and use of the properties.

[III.] The trial court erred as a matter of law in concluding that the alleged pollution incidents at 1655 Watkins Road were not covered by the GLEE Policy because they commended before the January 11, 2016 retroactive date in Manuscript Endorsement 002 to the GLEE Policy.

[IV.] The trial court erred as a matter of law in concluding that Plaintiff's claim for coverage under the GLEE Policy was not timely made.

## III. Analysis

{¶ 25} In its four assignments of error, Garrison asserts the trial court erred in granting summary judgment in favor of Aspen because it improperly construed the terms and provisions governing coverage under the GLEE policy and in finding that Garrison did not timely report its claims for coverage to Aspen.

### A. Standard of Review

{¶ 26} We review a decision on a motion for summary judgment under a de novo standard. *LRC Realty, Inc. v. B.E.B. Properties*, 160 Ohio St.3d 218, 2020-Ohio-3196, ¶ 11. De novo appellate review means the court of appeals conducts an independent review, without deference to the trial court's decision. *Wiltshire Capital Partners v. Reflections II, Inc.*, 10th Dist. No. 19AP-415, 2020-Ohio-3468, ¶ 12. Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997). In ruling on a motion for summary judgment, the court must resolve all doubts and construe the evidence in favor of the nonmoving party. *Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 6. Next is dupe too

{¶ 27} Pursuant to Civ.R. 56(C), the party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The moving party cannot satisfy this initial burden by simply making conclusory allegations, but instead must demonstrate, including by use of affidavit or other evidence allowed by Civ.R. 56(C), that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Wiltshire Capital* at ¶ 13. If the moving party fails to satisfy this initial burden, the court must deny the motion for summary judgment; however, if the moving party satisfies the initial burden, the nonmoving party has a burden to respond, by affidavit or otherwise as provided under Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial. *Dresher* at 293; *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. No. 11AP-1068, 2012-Ohio-5036, ¶ 12, citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991).

## B.  Fourth Assignment of Error—Whether Claim Was Timely

{¶ 28} In its fourth assignment of error, Garrison argues the trial court incorrectly found that it did not timely assert its claim to Aspen under the terms of the GLEE policy. The GLEE policy in this case is a claims made policy covering the period from April 12, 2015 to April 12, 2016.

{¶ 29} Insurance policies include both claims made policies and occurrence policies. Under an occurrence policy, coverage exists for acts committed during the policy period regardless of when the claim is brought. *See United States v. Strip*, 868 F.2d 181, 184 (6th Cir.1989); *Mominee v. Scherbarth*, 28 Ohio St.3d 270, 298 (1986), fn. 24. However, under a claims made policy, " 'coverage exists only when the insured presents a claim to the insurer within the policy period, or an extended period as allowed by the policy.' " *Hedmond v. Admiral Ins. Co.*, 10th Dist. No. 02AP-910, 2003-Ohio-4138, ¶ 32, quoting *Asp v. Ohio Med. Transp., Inc.*, 10th Dist. No. 00AP-958 (June 28, 2001). " 'The existence of a cut-off date is integral to a claims-made policy, as it is "a distinct characteristic of such a policy that directly relates to rate setting." ' " *Asp*, quoting *Checkrite Ltd., Inc. v. Illinois Nat. Ins. Co.*, 95 F.Supp.2d 180, 191-92 (S.D.N.Y.2000), quoting *Rochwarger v. Natl. Union of Fire Ins. Co. of Pittsburgh, Pennsylvania*, 192 A.D.2d 305 (1993). *See Mueller v. Taylor Rental Ctr.*, 106 Ohio App.3d 806, 811-12 (8th Dist.1995), quoting *Zuckerman v.*

*Nat. Union Fire Ins. Co.*, 100 N.J. 304 (1985) (stating that " '[t]he obvious advantage to the underwriter issuing "claims made" policies is the ability to calculate risks and premiums with greater exactitude since the insurer's exposure ends at a fixed point, usually the policy termination date. This may result in lower rates for the insured' "); *Hasbrouck v. St. Paul Fire & Marine Ins. Co.*, 511 N.W.2d 364, 366 (Iowa 1993) (stating that under a claims made policy "the obvious benefit to the underwriter is that there is no open-ended 'tail' after the expiration date of the policy" such that the " 'insurer can establish his reserves without having to consider the possibilities of inflation beyond the policy period, upward-spiralling jury awards, or later changes in the definition and application of [the law]' ") (Citation omitted.); *Chas T. Main, Inc. v. Fireman's Fund Ins. Co.*, 406 Mass. 862, 865 (1990). " 'To allow coverage beyond that period [in a claims made policy] would be to grant the insured more coverage than he bargained for and paid for, and to require the insurer to provide coverage for risks not assumed.' " *Kentucky Med. Ins. Co. v. Jones*, 10th Dist. No. 02AP-817, 2003-Ohio-3301, ¶ 62, quoting *Strip* at 184.

{¶ 30} "It is axiomatic that an insurance company is under no obligation to its insured, or to others harmed by the actions of an insured, unless the conduct alleged of the insured falls within the coverage of the policy." *Gearing v. Nationwide Ins. Co.*, 76 Ohio St.3d 34, 36 (1996). *See Allstate Ins. Co. v. Campbell*, 128 Ohio St.3d 186, 2010-Ohio-6312, ¶ 8. " 'Coverage is provided if the conduct falls within the scope of coverage defined in the policy, and not within an exception thereto.' " *Id.*, quoting *Gearing* at 36. *See Reed v. Davis*, 10th Dist. No. 13AP-15, 2013-Ohio-3742, ¶ 10.

{¶ 31} Here, as previously noted, the trial court found that Garrison's claim for coverage was not made and reported during the policy period from April 12, 2015 to April 12, 2016 as required by the claims made GLEE policy. The trial court found the alleged pollution incidents in Garrison's complaint began and were known to Garrison prior to the close of the policy period on April 12, 2016. The trial court pointed to Garrison's contentions in the actions Garrison filed in August 2015 and March 2016 against Closed Loop as evidence of Garrison's awareness of the claims. However, because Garrison failed to notify Aspen until its May 6, 2016 letter, the court found Garrison's claims were not covered under the terms of the claims made GLEE policy.

{¶ 32} Garrison argues the trial court erred in its findings regarding the beginning of the pollution incidents and Garrison's awareness of the same. Specifically, Garrison argues its claim for clean-up costs was not ripe until the April 11, 2016 notice of violation letter from Ohio EPA. As the Ohio EPA letter was dated one day prior to the expiration of the policy period, Garrison argues we should recognize an exception to the general rule under claims made policies for so-called "eleventh hour" claims. (Garrison's Brief at 39.) In support of this argument, Garrison points to *Helberg v. Natl. Union Fire Ins. Co.*, 102 Ohio App.3d 679, 682 (6th Dist.1995).

{¶ 33} In *Helberg*, the policy period ran from December 11, 1990 to December 11, 1991. The insured became aware of a claim on October 21, 1991, but failed to report the claim until January 21, 1992. The policy stated that coverage was available "for 'any claim * * * first made against the insured and reported to [the Insurer] during the policy period.' " *Helberg* at 680-81. Under that language, coverage was not available to the insured since the claim was not reported until several weeks after the policy period had ended. However, another provision in the policy stated that coverage was available "to any claim arising out of any acts or omissions occurring prior to the effective date of the first policy issued to the named insured by [the Insurer] and *continuously renewed thereafter* if any insured on such date knew or could have reasonably foreseen that such acts or omissions might be expected to be the basis of a claim or suit." (Emphasis sic.) *Id.* at 682. Based on the "continuously renewed thereafter" provision, the court found the parties "expected the coverage to be continuous if the policy was renewed at each successive policy expiration." *Id.* Because the insurance policy had been continuously renewed, the court found the policy was ambiguous regarding when a claim was required to be reported. Construing the ambiguity in favor of the insured, the court found the notice was timely.

{¶ 34} We find the present case to be distinguishable from *Helberg* for several reasons. First, there is no ambiguity present in the terms regarding the policy period for coverage of the GLEE policy. *See Asp* (distinguishing *Helberg* on grounds that the insurance policy at issue did "not contain a 'continuously renewed thereafter' clause"). Garrison points to the "Related Claims" provision in the GLEE policy to argue that the policy contains language similar to that in *Helberg*. However, in referencing the Related Claims provision for Coverage 3A, Garrison omits portions of the relevant text preceding

its cited provision. The Related Claims provision of the GLEE policy becomes effective and modifies "Coverages 3A through 3C (Site Pollution Incident Liability coverages)" only "if a claim is first made against an insured and *reported to us during this policy period*, or under Coverage 3A (On-Site Clean-Up Costs) a pollution incident is first discovered by a responsible executive and *reported to us during this policy period*." (Emphasis added.) Thus, the provision in its entirety makes clear that it applies when the claim or pollution incident is reported during the policy period, unlike the ambiguous provision in *Helberg*.

{¶ 35} Furthermore, this situation does not present a true "eleventh hour" situation of the type suggested by Garrison.[4] Instead, the record reveals that Garrison was aware of the conditions at the Watkins Road properties substantially prior to Ohio EPA's April 11, 2016 final notice of violation. In Garrison's August 3, 2015 complaint against Closed Loop regarding the 1655 Watkins Road property, Garrison stated that "[i]t would take Garrison months, and cost substantially more than a million dollars, to remove [d]efendant's Personal Property from the Premises." (Ex. A-5, No. 14 at 3.) Garrison also stated that "[d]efendant's abandonment of the scrap Personal Property at the Premises is likely to subject Garrison to oversight and regulation by the Ohio Environmental Protection Agency, causing Garrison additional significant costs that cannot be quantified." (Ex. A-5, No. 14 at 3.) In its March 4, 2016 complaint against Closed Loop regarding the 1675 Watkins Road property, Garrison stated:

> Closed Loop has breached the Lease by *leaving the Premises* with millions of pounds of discarded cathode ray tubes and ancillary scrap materials (the "Scrap Material") filling the Premises and otherwise *contaminating the Premises*. It will cost Garrison millions of dollars to remove Scrap Material from the Premises and have it deposited at an appropriate land fill, and to *remediate Defendant Closed Loop's contamination of the Premises* (together, the "Environmental Clean-Up").

(Emphasis added.) (Ex. A-5 No. 12 at 4.) Furthermore, Garrison stated that "[i]n March 2016, Closed Loop personnel abandoned both the 1655 and 1675 Watkins Road properties." (MSJ, Ex. A-28 at 4.) Thus, Garrison's very own claims against Closed Loop demonstrate Garrison's awareness of the conditions at the Watkins Road properties.

---

[4] As the circumstances in this case do not present a question as to the applicability of any equitable exception to claims made policies, we specifically make no determination as to the same.

{¶ 36} Furthermore, discovery in the present matter revealed other evidence supporting Garrison's awareness of the alleged pollution incidents at the Watkins Road properties prior to the April 11, 2016 Ohio EPA letter. In an e-mail correspondence, a representative of Garrison stated that "[w]e discovered the 'pollution event' in 2015." (MSJ, Ex. A-16 at 1.) The Garrison representative further noted that there were discussions at Garrison concerning the "applicability of environmental insurance coverage concerning the Watkins Road situation in 2015." (Ex. A-16 at 1.) In an e-mail dated October 19, 2015, a representative of Garrison discussed whether "[i]n the event we evict this tenant, Closed Loop, from 1675 and 1655 Watkins Road" Garrison could "access * * * environmental [insurance] coverage and use it to clean out [Closed Loop's] space." (MSJ, Ex. A-40 at 1.)

{¶ 37} In January 2016, Garrison received a memo from HUB International analyzing insurance coverage under the GLEE policy for the Watkins Road properties. The memo specifically noted that it was prepared after "Garrison enquired as to whether environmental insurance would pay for the removal/cleanup costs at the [Watkins Road properties]." (MSJ, Ex. A-41 at 2.) In February 2016, Garrison provided a summary of the memo's conclusion in an update to its investors. In an e-mail dated April 4, 2016, HUB International recommended that Garrison "[s]ubmit a third party claim under Closed Loop's Environmental Liability policy with Aspen now." (Ex. A-42 at 4.) In the same e-mail, HUB International informed Garrison that the GLEE policy "coverage expires on 4/12/16, and suggest your Ohio environmental counsel send a demand letter to Closed Loop and their insurance broker advising of * * * [p]ollution conditions at Garrison property (1655 and 1675 Watkins Rd, Columbus, OH) due to Closed Loop's operations * * * [and a] release of hazardous materials requiring remediation." (Ex. A-42 at 4.) Garrison also received a copy of Closed Loop's site closure plan, which was dated June 30, 2015, for the closure of the facility at 1675 Watkins Road.

{¶ 38} Thus, the record reflects that Garrison was aware of the existence of the alleged pollution incidents at the Watkins Road properties prior to Ohio EPA's April 11, 2016 letter. Furthermore, it is undisputed that Aspen was not aware of Garrison's prior actions against Closed Loop which were originally filed on August 3, 2015 and March 4, 2016. Based on the foregoing, we conclude that no issue of genuine material fact remains for trial and therefore find the trial court correctly determined that Garrison's claim for

coverage was not timely made within the policy period of the claims made GLEE policy. Accordingly, we overrule Garrison's fourth assignment of error.

### C. First, Second, and Third Assignments of Error

{¶ 39} In its first and second assignments of error, Garrison asserts the trial court erred in its construction of the provisions and terms under the GLEE policy. Specifically, Garrison asserts the trial court erred in its construction of the term "pollution incident" as applied to Coverage 3A for site pollution incident liability. Furthermore, Garrison asserts the trial court erred in finding that Garrison's claim is not covered under Exclusions c and g for Coverage 3A under the GLEE policy because the claim arises out of the insured's anticipated regular business activities or a change in the insured's operations and use of the properties. In its third assignment of error, Garrison argues the trial court erred in finding the pollution incidents at the 1655 Watkins Road property were not covered because the alleged pollution incidents occurred prior to the January 11, 2016 retroactive date. Having found in our resolution of the fourth assignments of error that Garrison's claims cannot succeed because they failed to timely notify Aspen within the policy period of the claims made GLEE policy, it is unnecessary for us to address Garrison's assertions under the first, second, and third assignments of error. Accordingly, Garrison's first, second, and third assignments of error are rendered moot.

## IV. Conclusion

{¶ 40} Having overruled Garrison's fourth assignment of error, thereby rendering moot Garrison's first, second, and third assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and MENTEL, JJ., concur.

_____